THE CITY OF INDIANAPOLIS *v.* LAWYER ET AL.

CITY.—*Drainage.*—*Injury to Adjoining Property.*—Where, by its system of drainage, a city has accumulated a large flow of water on a particular street, it is its duty to provide for the escape of the water without damage to adjoining property.

SAME.—*Railroad.*—If a city permit a railroad company to occupy and cross streets and alleys, and require it to construct culverts, and the city adopt them for its use, and they prove insufficient, or become out of repair, the city will be liable for injury resulting to adjoining property by reason of such insufficiency.

SAME.—While the city will not be liable for injury resulting from defective sewers constructed for the exclusive use of the railroad company, still she cannot delegate her general power and adopt the work of the company as part of her general system without responsibility for defects in the work.

PRACTICE.—*Demurrer to Evidence.*—On a demurrer to the evidence, it is the duty of the court to take as true the propositions of fact established by the evidence, and to infer from the evidence every conclusion which the jury could reasonably have drawn from it.

SAME.—*Interrogatories to Jury.*—Where there is a demurrer to the evidence, interrogatories should not be submitted to the jury in assessing damages.

APPEAL from the Marion Common Pleas.

DOWNEY, J.—The appellees sued the city. In the amended fourth paragraph of the complaint, which was the only paragraph held by the court to be sufficient, they alleged, that on the 7th day of May, 1865, they leased for a term of ten years certain real property in said city, and erected thereon a large and commodious warehouse, with steam elevators, for the purpose of storing and moving large quantities of grain or other produce; that there was by nature a free and easy drainage of said ground, and that the water falling on and flowing by or over said ground naturally had a free and easy and rapid exit and egress into Pogue's Run, by which it was carried away; that the city of Indianapolis, the defendant, who has sole jurisdiction for the improvement and drainage of streets and building of sewers within the corporate limits of said city, had adopted and maintained a system of sewerage and drainage, and so constructed the drains and sewers that the rain falling upon a vast extent of territory, to wit, a space of about six hundred acres, had been caused to flow down the gutter of New Jersey street, in front of plaintiffs' property, and thence by gutters and sewers into Pogue's Run; and that said city had thus vastly increased the volume of water naturally flowing by or over the plaintiffs' said grounds; that notwithstanding the natural drainage and exit

and egress of said water was free and unobstructed, and easy and rapid from said ground into Pogue's Run, and although the city, by the system of sewerage and drainage adopted by her, has vastly increased the volume of water flowing by said ground of the plaintiffs, yet the defendant, the said city, has failed to provide a sufficient way of exit and egress for such increased volume of water; and has so negligently and unskilfully, and in such an imperfect and defective manner, constructed and maintained the drains and sewers on said New Jersey street, and leading from the point opposite plaintiffs' property into Pogue's Run, to wit, by making and keeping said drains and sewers wholly insufficient in size and capacity to carry off the water which was compelled to pass through them, and by obstructing all other egress or exit for said water, except through said insufficient and defective sewers and drains, and by suffering and permitting said sewers and drains to remain and continue stopped up, and choked up, so as to prevent and obstruct the flow and passage of the water passing down said street, and to dam up the water, and cause the same to back and rise and stand in front of plaintiffs' property, on New Jersey street, and above and around said property, at great depth, to wit, four feet above the grade established by said city, which was higher than the natural surface, where prior to said obstructions, so caused and permitted by the said defendant, no water stood; and that by the negligent and insufficient and defective and unskilful construction of such drains and sewers, and by wrongfully and negligently permitting and suffering such defective and insufficient drains and sewers to become and remain filled up and choked and obstructed, the said defendant had caused the water to be dammed and backed up, and to rise and stand on New Jersey street, in front of and above plaintiffs' property, and around the same, at divers times, which could not then be particularly set forth or enumerated; but in April, 1865, the exact day whereof could not be given from memory, and no memorandum was kept, and at divers subsequent times during said summer,

the precise dates whereof could not be given, and on or about the first day of September, 1866, to flow into plaintiffs' building as aforesaid, and into their metal-lined, water-tight sinks, the tops of which were eighteen inches above the grade established by said city; whereby large quantities of grain were injured and destroyed, at the times deposited in said sinks, for the purpose of being removed by said elevators, to wit, five thousand bushels of wheat, of the value of three dollars per bushel; and that said sinks and machinery were greatly injured and damaged, in the sum of two thousand dollars; and that they were stopped and interrupted in their business, which was large and lucrative, and thereby suffered damages in one thousand dollars, in all seven thousand dollars; all without fault or negligence on their part contributing or adding thereto; wherefore plaintiffs demand judgment for seven thousand dollars, etc. Filed with the complaint was a bill of particulars, setting forth the items making up the aggregate of the plaintiffs' claim.

The defendant made some preliminary motions with reference to the complaint, the overruling of which is alleged for error in this court; but the questions are not properly presented for our consideration. The overruling of a demurrer to the fourth paragraph of the complaint, on the ground that it did not state facts sufficient to constitute a cause of action, is also assigned for error; but no notice is taken of this point in the briefs of counsel for the city, and we have not, unaided, discovered any defect in it.

The answer of the defendant was in three paragraphs; the first was a general denial of the complaint; the second was held bad on demurrer thereto by the plaintiffs, and of this there is no complaint in the assignment of errors; the third alleged, in substance, that the injuries of which the plaintiffs complained were occasioned by the sewers and culverts constructed by certain railway companies, to wit, the Union Railway Company, the Bellefontaine Railroad Company, the Indiana Central Railway Company, and the Peru and Indianapolis Railroad Company; that said railroad com-

panies erected and constructed said culverts and sewers for their own use and convenience, and under and by virtue of the authority conferred upon them by the grant of the right of way through said city, granted by the common council of said city.

The plaintiffs replied to the third paragraph of the answer by general denial thereof; and, secondly, that before the happening of the grievances mentioned in the complaint, the city had adopted the sewers, drains, and culverts in question, as a part of its system of drainage, with a knowledge of their insufficiency, etc.

The cause was submitted to a jury for trial, when, after the evidence of the plaintiffs was concluded, the defendant demurred thereto, and the plaintiffs joined in the demurrer. The jury thereupon assessed the plaintiffs' damages, conditionally, at six thousand five hundred and ninety-nine dollars and thirty-eight cents. They also answered a great number of minute interrogatories relating to the particulars of the damages, which we need not further notice in this place.

The demurrer to the evidence, having been submitted, was overruled by the court, and the evidence was held sufficient to sustain the action. The plaintiffs, before the decision on the demurrer, remitted four hundred and eighty dollars of the amount of the verdict, which was allowed by the jury on account of the flood of September, 1866.

The defendant moved the court to grant a new trial, for the reasons following:

1. The court erred in admitting evidence of MacArthur concerning the proceedings of the common council. 2. The court erred in admitting the evidence of Davis and Cottrell concerning the proceedings of the common council. 3. The verdict of the jury is contrary to law. 4. Excessive damages. 5. Error in the assessment of damages, in this, that the damages allowed plaintiffs are too great. 6. Error in submitting to the jury the 1st, 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, and 14th interrogatories by plaintiffs. 7.

Error in striking out the interrogatories propounded by the defendant. 8. Error in striking out the 14th interrogatory asked by the defendant. 9. Error in striking out 18th, 21st, 22d, 25th, 26th, 27th, 28th, and 29th interrogatories propounded by the defendant; to the refusal to submit to the jury each and all of the foregoing interrogatories, the defendant at the time excepted. 10. Error in overruling the defendant's motion to strike out part of the 4th paragraph of the complaint. 11. Error in overruling defendant's motion to separate 4th paragraph of the complaint. 12. Error in overruling defendant's motion to strike out the 5th, 6th, 10th, and 13th interrogatories propounded by the plaintiffs. 14. Error in overruling the defendant's motion to strike out the 2d and 3d paragraphs in reply. 15. Error in overruling the defendant's motion to make the complaint more definite. 16. Error in overruling the defendant's demurrer to the evidence. The court overruled the motion for a new trial, and the defendant excepted. The defendant then moved the court in arrest of the judgment, and filed reasons:

1. There is no sufficient legal complaint.

2. The record shows the defendant is entitled to judgment.

3. The demurrer to the evidence should have been sustained.

Which motion in arrest of judgment the court overruled, and the defendant excepted to the ruling of the court.

The court then rendered judgment for the plaintiffs for the amount of the verdict, less the amount remitted.

As the evidence is necessarily set out in a demurrer thereto, we suppose an exception to the ruling of the court in sustaining or overruling the demurrer presents the question to us on appeal, as to the correctness of the ruling, without a motion for a new trial.

The evidence on the part of the plaintiffs is contained in the demurrer, and is substantially as follows:

The following maps were proved to be correct representations of the place where the overflow occurred:

The City of Indianapolis *v.* Lawyer *et al.*

DIAGRAM "A" OF MR. WILES.

DIAGRAM "B" OF MR. LOWE.

The City of Indianapolis *v.* Lawyer *et al.*

Joseph W. Davis testified: I have lived in the city eighteen years; was member of the city council in 1867 and 1868; part of the time was member of the board of public improvements; I made an examination of the sewers and culverts and drains complained of; passed by them very often; the territory drained through New Jersey street extends as far north as North street, and west to Pennsylvania street, and east to East street; it is seven squares to North street, and from Pennsylvania to East street is four squares; the squares are four hundred and twenty feet; contain four acres; all the water from the above territory is concentrated on New Jersey street, and comes down through the drain on the west side; the drains and sewers on New Jersey street form part of the general system of drainage of the city; the plaintiffs' premises are on the east side of New Jersey street, and south of Washington street; the sewers or culverts commence two hundred feet south of a line running parallel from Maryland street, and plaintiffs' place is about fifty feet north of that; before the railroads were built, the grounds were low; water stood on them at times; naturally water came down this street; a great many years ago there was a bayou extending down across North New Jersey street, near where the engine house is, a square west of New Jersey street, and down across New Jersey street. The lots in the vicinity of New Jersey street and Pogue's Run were formerly very low; think they have been filled up; the old bayou crossed New Jersey street near corner of Market street, and entered Pogue's Run west of New Jersey street; a large part of the city on the east has always been drained down New Jersey street; the whole system of drainage is wrong; instead of taking the water of five or six streets down one, the drainage of every street should have been drained directly to Pogue's Run; the eastern part of the city, from Pennsylvania to East street, is drained south down New Jersey street, and the west part of the city down Illinois street; the old sewer was constructed when the Bellefontaine Railroad Company located their shops; their

shops were located on their lot just west of culvert; this was in 1853 or 1854; the culvert was covered with railroad cross-ties; the culvert was insufficient, and caused the injury to the plaintiffs; if the top had been off, the culvert might have been sufficient; if there had been no sewer, the water would have run off; the grade of the street has been raised fully two feet; railroad tracks are higher than New Jersey street north of them; the Bellefontaine Railroad Company has the northern tracks, the Union Railway Company has two tracks, and the Central Railway Company has four tracks crossing this culvert; plaintiffs' lot is south of old tanyard, about on a level with old tanyard lot; the Bellefontaine Railroad Company's shops were moved from their lot fronting on New Jersey street about four years ago; I have no knowledge as to who built the sewer; the ditch on this grade was done by the city before street was graded; in 1852 I lived on North New Jersey street, one square north of Washington street; New Jersey street has been improved since sewer was constructed; in 1865 and 1866, original sewer was covered; cover since taken off.

Thomas Cottrell, a witness introduced by plaintiffs, testified substantially as follows: Am a member of the city council; first elected in 1857; then a member four years, and two years since 1867; it was not my duty to examine anything only what was referred to committee on streets and alleys, of which I was chairman; New Jersey street sewers were never referred; know something about gutters and sewers; think there has been too much water drained down New Jersey street; the gutters are extraordinarily deep; the inlet to the sewer is too small; I know that part of the sewers and culverts were built by the railroad companies; do not know that the city built any part of them; am not certain who built the culvert; the north end of the culvert is at least one-half too small; it may be that the sewer is too much contracted at the mouth; do not know; the opening is at least one-half too small; don't know anything about 1865 or 1866; were the opening larger, water

would pass off; the stone walls are about eighteen inches in the clear; don't recollect anything about 1865; don't believe it has been changed since; the old sewer extends about thirty or thirty-five feet north of most northern track; don't know whether any track was laid since 1865; if there were no culvert or covered sewer, the water would pass; it was the culvert which obstructed the water; think the first railroad track was built in 1853, and I know that part of the sewers and culverts were constructed by railroad companies; they first put in timber sewers; they have reconstructed a good many since with brick and stone; no culvert there until railroad tracks were built; thirty feet north of the present culvert or sewer there are two parallel stone walls; inlet to nearest covered sewer sufficient to accommodate water that would pass through the two stone walls; am only guessing at capacity of sewers; don't know about when the sewers were uncovered, nor who did it.

Joseph W. Davis recalled: The parallel stone walls, spoken of by Mr. Cottrell, extend from the culvert north, and are the walls which I spoke of as being covered with cross-ties; when covered in 1865, it was two feet from top of culvert to bottom of culvert; this is the original sewer which was constructed at the time of building of the Bellefontaine railroad, and covered with cross-ties; the sidewalk slopes down to the sewer; the stone walls are part of the gutter; it is about four feet from the level of the sidewalk to the bottom of the drain.

John B. MacArthur testified: Am a member of the city council; elected in May, 1865; in 1866 was a member of the board of public improvement; it was my business to examine sewers; best of my recollection is, that I examined the sewer in 1867; often saw it before that time; think it has been altered since 1865; don't know by whom the original sewer was constructed; think the condition of these sewers was canvassed before the council in 1866; Mr. Lawyer called my attention to the sewers being overflowed; I saw wheat

lying in his house; when I saw the sewer I considered it was not large enough.

Mr. Wiles testified as follows: I did business on South New Jersey street, and knew the condition of the culverts in 1866, but cannot give the exact size; it is now twenty feet from the present track to the north end of the present covered sewers, and from north end of culverts to north end of two parallel stone walls is forty-seven feet; these stone walls were covered in 1865; the sewers were obstructed in 1865 or 1866, by timber thereof rotting and falling in; it was a common thing to be overflowed, and the water often ran across New Jersey street; there was not a heavy rain but what it ran through the house I occupied; and when it did this, it always ran across New Jersey street; grade of New Jersey street was made by the city; Mr. Lawyer is a dealer in grain and wheat; I know that he has repeatedly suffered injury from these overflows; saw his floor spread with wet wheat; Mr. Lawyer's property was not subject to overflows from any other cause than the insufficiency of the culverts; he would not have been overflowed unless the water had run across New Jersey street; his property is on New Jersey street, east side, about two hundred and fifty-three feet from Pogue's Run; the culvert is on the west side of New Jersey street; have lived in the city since 1860; there are some fifteen railroad tracks crossing culverts; between some of the tracks there is a space of eight feet—width of tracks, four feet ten inches; on lot opposite Mr. Lawyer, the Bellefontaine Railroad Company formerly had their shops; they were removed, I think about 1864; the lot fronting on New Jersey street, and west of culverts, belongs to the Bellefontaine Railroad Company; length of culvert about one hundred and eighty-five feet; length of the open stone walls, forty-seven feet; these open walls were covered in 1865 or 1866; this diagram shows something near the locality (diagram introduced); it is about three hundred feet from point marked X on diagram to the line of Tate's lot which lies immediately north of the Bellefontaine Railroad Company's

lot; the lot between the north bank of Pogue's Run and Tate's lot was used by the Bellefontaine Railroad Company for their shops, round-house, and out-buildings; the lines marked one to fifteen represent railroad tracks crossing the culvert or sewer; from the point X to further extremity of open stone walls is two hundred and fifty-three feet; from the bank of the Run to Lawyer's is two hundred and fifty feet; the parallel stone walls were covered in 1865 and 1866, with timber and dirt; the log at north end broke and fell in; don't know what timber it was covered with; the first at the opening was a round log; it was a square sewer, was uncovered, the covering being partly rotten.

William Gogin testified, that he resided next door to Lawyer's; went there in August, 1865; know of an overflow to Mr. Lawyer's building; the reason of it was, the culvert at New Jersey street was not large enough; the water came across New Jersey street, forty-five feet north of Mr. Lawyer's premises, and run into Mr. Lawyer's; Mr. Lawyer had a large amount of wheat injured; cannot tell the amount; water run across New Jersey street three or four times during 1865 or 1866;   *   *   to keep the water from coming over by damming up; water came over there in March, 1865; none I think came over in the spring of 1866; it did in September, or fall of 1866; it was a great flood then; I saw water in Lawyer's sinks several times; the sewer which caused the damage to Mr. Lawyer was at intersection of New Jersey street and the railroad tracks; it had stone walls and a wooden top; the flood of September, 1866, was unusual—the highest since I can remember; think water ran into Lawyer's premises three or four times in 1865 and 1866; the most damage was done by the flood of 1866; can't tell how much wheat I saw that was injured; may be one hundred and fifty to two hundred bushels; don't know whether more than that or not; saw wagons hauling it away; don't know how much wheat was in sink in March, 1865 and 1866.

M. H. Lowe testified as follows: My place of business is on New Jersey street, north of Wiles' premises; am ac-

quainted with the drains and culverts; if the covered culvert
had been large enough, the water would have passed off; the
obstruction was in the mouth of the small sewer or culvert;
it was too small, and closed up by the deposit of rubbish,
and caused the water to back; never took any measurement;
think it was seventy-five feet from the railroad track, the
covered culvert extending north from the railroad track; I
think, as the culvert now is, it extends about twenty feet
north of the railroad track; by the culvert the water was
dammed up and overflowed twice in 1865 and 1866; can't
say what time it was in 1865 that it overflowed Lawyer &
Hall; not liable to overflow from any other cause than that
culvert insufficient; sewers were covered in 1865, and were
uncovered some time in 1866 or 1867; can't say who un-
covered them.     Plaintiffs hand witness diagram B.     The
space marked thereon shows Mr. Lawyer's premises; the
culvert is on the west side of the street; the water run across
the street into Mr. Lawyer's; don't think Mr. Lawyer's lot
was subject to overflows because of its location; the water
stood one foot deep in my shop, and I am one hundred and
fifty feet north of plaintiffs' house; the stone walls, now un-
covered, were covered with timber and dirt in 1865 and
1866; don't know whether with railroad cross-ties or not; I
did not live in the neighborhood when the culvert was orig-
inally built; the space shown on the diagram between Tate's
lot on the north and Pogue's Run on the south belonged to
the Bellefontaine Railroad Company, and was formerly for
the purpose of shops, round-houses, and out-buildings; the
lot is that marked on the diagram, "Bellefontaine yard;" the
point marked A shows my shop, that marked B Mr. Wiles'
place, and C Mr. Tate's; the spots marked "out-buildings,"
round-house, repair-shops, and turn-table, show about the
former location of their buildings; can't say how many
railroad tracks cross this culvert; perhaps as many as fifteen
or twenty; think the Union Railway Company, the Belle-
fontaine Railroad Company, the Peru and Indianapolis Rail-

road Company, and the Indiana Central Railway Company cross New Jersey street at intersection here.

Defendant admits that the plaintiffs are the lessees of the premises in complaint described, and that they are in the city of Indianapolis, but reserves the right to examine witnesses as to location and surroundings.

Peter C. Lawyer then testified as follows: We built two buildings; were engaged in dealing in wheat and grain, and have elevator and proper appendages; the sinks for the reception of the grain are below the foundation of the building; the sinks are 20 by 25 feet at the top, and taper to the bottoms about two and one-half to four feet; they were made water tight and lined with double tin; they were used in moving wheat by the elevator; the tops of the sinks were above the grade of the street nearly two feet in 1865; the sewer, for about seventy-five feet north of the Bellefontaine railroad, was covered with timber and dirt; the timber broke and fell in, and obstructed the culvert, and obstructed the flow of water; with the covers off it was perhaps sufficient in size, but in 1865 and 1866 the culverts were covered from the mouth to the end of the parallel stone walls with dirt and timber, and when covered were wholly insufficient; I never reported this matter to the common council when in session; the inlet of the sewer is about seventy-five feet north of the railroad track, and was stopped up by timbers and rubbish in March, 1865, and caused the water to run across New Jersey street and come into our premises, and six hundred bushels of wheat were totally destroyed; I think at first the overflown water came in the night; my clerk was with me; we put a bale of hay to stop the water, and it caused the foundation to give away, and water came in; it flowed into my sinks over the tops; it was not possible for me to have prevented the injury; the wheat was worth $1.65 per bushel; cost of repairing sinks was about $400; can't say how much it did cost to repair foundation; the labor of cleaning out was $100; suffered no other damage from flood of March, 1865; in the years 1865 and 1866 we

were overflown not less than twenty times; we sustained a great deal 'of injury, always lost more or less wheat; the night before the big overflow in 1866, we lost 300 bushels of wheat, worth $1.10 to $1.60 and $2 per bushel; this over-flow occurred in September, 1866, and was about 10 o'clock on night which preceded the big flood; obstruction in the culverts was what caused the overflow; of the wheat injured we probably got something, say sixty cents per bushel for it; Pogue's Run did not overflow till next day; there was nothing omitted that we could do to save the wheat; often found water coming in in the night, and would sometimes lose five or six bushels; figured up that we lost this way about 100 bushels; figured this at $1.65 per bushel; this embraces the total losses; we sustained great damage by wheat getting wet; sound wheat worth about $1.60, after getting wet worth about half price; sold 288 bushels in Toledo, which had been wet, for $98.92; I think that 5,095 bushels were wet and manufactured into flour; the reason of the overflow was the obstruction and insufficiency of the sewer; could not sell this wheat in the market here, and had it made into flour, 625 barrels, which I sold in New York for $3,267.67; I think the reasonable value of loss of use of elevator about $300; cannot say what were the damages to the foundations; they were twenty-five feet long, about three feet high; about one-half the brick were new; from the north bank of Pogue's Run to my premises is about three hun-dred feet; the diagram B shows the location of my prem-ises; nearly all the space between our place and Pogue's Run is occupied by railroad companies; the cause of all my loss was the insufficiency of, and obstruction in, the sewer at the point marked E on said diagram B; think there are fifteen or twenty railroad tracks crossing this culvert; the tracks are those of the Union Railway Company, the In-dianapolis and Bellefontaine Railroad Company, and the Indiana Central Railway Company; I think the diagram as explained by Mr. Lowe is correct; the ground between Tate's lot on the north and Pogue's Run on the south is

that of the Bellefontaine Railroad Company, and is used for railway purposes; the company had their round-house, shops, and other buildings there, but they have been removed; the buildings were all built near together; there is no street or alley, that I know of, running into the said Bellefontaine lot; I have seen wagons and teams crossing into it; I mean the lot fronting on New Jersey street, and extending from Tate's line to Pogue's Run; we filled up our lot in 1863; lot is lower than street grade, but the house and buildings are higher; we were engaged in buying and shipping grain; the culvert was of insufficient size, and when covered was two feet square; it was a flat sewer, not arched; the walls were of stone, about two feet high, and on them timbers were laid; think the front timber was a round log, the rest were railroad cross-ties; I don't know who built the culvert; have always thought that had the culvert been uncovered the water would have passed into the creek without overflowing; there was no other cause for the overflowing of our premises, except the insufficiency of the sewer, and the obstructions therein; the water did not back up from the creek; it was the water which ran across New Jersey street; wheat totally destroyed in 1865 was 600 bushels, worth $1.65 per bushel; I cannot give the dates of my losses; I came to Indianapolis in 1863; examined culverts in 1865; I gave the culverts particular attention after the first flood; after that examination, I came to the conclusion that the culvert was not sufficient; the objection to culvert was, that the log which rested on the extreme north end of the stone walls, now uncovered, had fallen down; I cannot tell what it would have cost to put the foundations of the building in the same condition they were before the overflow; the walls were sunk lower, and an outside wall built; can't tell what it did cost to repair foundation; it is necessary to construct sinks under ground; it is usual to do so; I cannot say what the market value of the wet wheat was; saw quotations in New York for sour flour, and had it ground into flour; I know nothing of the inner part; ex-

amined only the opening or inlet where the log was broken down one time, when I examined the mouth emptying into Pogue's Run; the sewer was not more than half full at the time I refer to; water in the creek was about on a level with mouth of sewer at that time; the water was dammed up at the other opening of the sewer, and I was overflowed; don't know who removed the covering; it was done after the fall of 1866; have never had any trouble since, and never expect any; the flood of 1866 was an unprecedented one; the flood which reached its height the day after the damage to us was done, was the great flood of 1866; my house was overflowed at 10 o'clock at night; worked till daylight in the morning getting out wheat; Pogue's Run overflowed at 10 o'clock; we got out all but 300 bushels by daylight; that we did not get out.

Christopher Heckman testified: Am a miller; wheat was brought me to grind into flour; I ground about sixty or seventy barrels of flour; wheat was musty; don't consider spoiled wheat worth more than middlings or offal; wheat worth about half of market value; saw good deal of wheat at Lawyer's store; could not tell how much it was worth; would not consider wheat worth more than one-half; wheat that lays under water a day and night is spoiled, it would reduce its market value one-half; the wheat was sent me from Mr. Lawyer's, it was generally bad; saw injured wheat in his warehouse; wheat wet; the flood of the fall of 1866 was an extraordinary and unprecedented one. Best family flour, from November 3d to November 8th, 1865, was worth $10 per barrel; difference between that and lower grades about $3 per barrel. From October 21st to October 30th, it was worth $10 to $10.50; from January 5th to February 7th, 1866, it was worth $10.

Peter C. Lawyer, plaintiff, recalled: The flour was sold in New York, January 5th, 1866, January 12th, 1866, January 22d, 1866, January 23d, 1866, and February 3d, 1866; it was shipped to New York, and there sold soon after its shipment.

The plaintiffs then introduced in evidence a contract for the improvement of New Jersey street, which contract is mislaid or lost.

And it is agreed by the parties that the contract was for grading and gravelling New Jersey street, from Washington street to Pogue's Run; that it was accepted by the common council in July, 1857; and the final estimate for the completion was reported to, and approved by, the common council in December, 1857.

The plaintiffs also introduced in evidence the following ordinance passed by the city council, ordaining, April 1st, 1850, that, in accordance with a petition presented, Thomas A. Morris, engineer on behalf of the Terre Haute and Richmond, Indianapolis and Bellefontaine, Peru and Indianapolis, and the Madison and Indianapolis Railroad Companies, or any three of them, be permitted to construct, within the limits of the city of Indianapolis, immediately, and upon the north bank of Pogue's Run, from Washington street to Meridian street, and to cross the run at any point they wish, their Union Railroad track, connecting the depots of the several roads named, as shown by a plat of said Union track, recorded in the recorder's office of Marion county; said road to be twenty-five feet wide, and to cross the following named streets, to wit: Massachusetts avenue, New York, Market, Noble, Washington, East, New Jersey, Alabama streets, Virginia avenue, Delaware, Pennsylvania, Meridian, Illinois, and Tennessee streets, and the several alleys, upon the following conditions: that they construct their road so as to conform strictly to the established grade of all the streets above named, and protect their rails at such crossings, by planking or otherwise, so as to offer no obstructions to the travel or convenience of the citizens, and also to provide suitable culverts, side gutters, or drains, wherever they now exist, or may hereafter be needed, and shall keep the same in good repair; and that no cars or locomotives shall ever be run at a greater speed than four miles per hour within the city limits; and that the city

engineer be directed to set the stakes, giving the grade of all the streets where the aforesaid crossings are made.

S. V. B. Noel testified: I was engaged in wheat and grain business in 1865 and 1866; March 1st, 1865, wheat was worth $1.65; wheat was worth $1.65 in September, 1866; price of new wheat ranged from $1.50 to $1.35; other wheat from $1.60 to $1.65; know that Mr. Lawyer had wheat damaged; saw wheat on his floor drying; was often at Lawyer's place of business; don't deal in damaged wheat.

Martin L. Coyner testified: I was the contractor for the improvement of New Jersey street; Virginia avenue is south of Pogue's Run; there was a drain under Washington street when I made the improvement; it was covered with plank; there were box sewers under the railroad tracks near Pogue's run; two little box sewers that the companies built; I made only such gutters as are usually made on streets; I think the box sewers were made by the railroad companies; I made the railway tracks along there, and graded the tracks; there might have been stone culverts; there were, I think, two little box culverts on each side of the street; don't think there was a very large culvert on the west side of the street; I made ordinary open gutters; built no culverts; the drain across Washington street extended across Washington street only; Washington street is about two squares north of the railroad tracks; I cannot say positively who built the culverts under the railroad tracks, but I think the railroad company did it; company graded track under Gen. Morris' directions; he was their engineer; I found the railroad tracks there when I began work, and graded the street to correspond with them; I can't say that I know who built the culverts, but I think it was the railroad companies.

August Richter testified: I was street commissioner in 1865 and 1866.

D. B. Hosbrook testified: Am a civil engineer; (plaintiffs exhibit diagram B to witness); I made it, and the marks and words were made by me, except those made by defendant's counsel when examining a former witness, which

marks and words are as follows: the letters A, B, C, D, E, the circles and marks representing round-house, repair-shops, and buildings of the railroad company, and the words round-house, repair-shops, and out-buildings of railroad company; diagrams introduced, and are the same heretofore set out; with said exceptions, diagram is as he made it; the distance from Pogue's Run to open walls is ————, from north railroad track to open walls sixty-seven feet, from culvert to extremity of said walls forty-seven feet, from north rail of north track to north rail of second track seven feet, from north rail to extremity of present covered culvert twenty feet, from north end of said culvert to north end of open wall forty-seven feet; Lawyer's place is one hundred and thirty feet north of the northern extremity of the wall; grade of street corresponds to grade of railroad track; the grade from Pogue's Run descends to northern track; I took levels opposite Lawyer's house on sidewalk; the grade is nearly one and a half feet lower than the Union track; Lawyer's floor is above the grade of the street one foot ten inches; the point marked on the diagram, "Lawyer's," represents the plaintiffs' premises; the railroad tracks are denoted by crossed lines; they are not all shown on the diagram; the southern and northern tracks only are shown; don't know how many tracks there are crossing the culvert; perhaps from twelve to twenty; I really don't know to what companies they belong; the space shown on the diagram fronting on west line of New Jersey street, and by me marked "Bellefontaine yard," and extending from Tate's line to the run, is used for railway purposes, and, as I understood, belongs to the company; I think they used to have their shops and round-house there; don't know when they were removed, but think about 1864; don't know of any streets or alleys crossing the west line of New Jersey street into the space above mentioned as the Bellefontaine yard; I don't think there are any; Mr. Lawyer was with me most of the time when I made the diagram; I think that it was day before yesterday that I made it.

Peter C. Lawyer, plaintiff, recalled, testified: The foundations of my premises have not been raised any since 1865; they are now the same as they then were.

Mr. Hewes, a juror, testified: Am a bricklayer; the cost of repairing the foundations was about fifty dollars.

Charles B. Robinson testified: My business is railroading; have been engaged in that business for thirty-two years; I constructed the sewers under New Jersey street for Union Railway Company, and rebuilt culvert under two extreme south tracks about three years ago; I understand how the ground lies; know something of the amount of water passing down New Jersey street; don't know who put in the sewers on the north; don't know when they were built.

The plaintiffs then read in evidence an ordinance of the city council of the city of Indianapolis, passed April 1st, 1850, authorizing the railroad companies composing, or to compose, the Union Railway Company of Indianapolis to run their tracks across New Jersey and other streets, immediately on the north bank of Pogue's Run, conforming to the grade of the streets, etc., in every particular, under the direction of the city engineer.

The material question in the case discussed by counsel is that presented by the fourth assignment of errors, that the court erred in overruling the demurrer to the evidence. In determining the question raised by the demurrer to the evidence, it was the duty of the common pleas to take as true the propositions of facts established by the evidence, and to infer from the evidence every conclusion which the jury could reasonably have drawn from it. *Griggs* v. *Seeley*, 8 Ind. 264; *Andrews* v. *Hammond*, 8 Blackf. 540, and note.

The following propositions of fact seem to have been established by the evidence contained in the demurrer:

1. The plaintiffs suffered great damage by the overflow of water.

2. The culvert or sewer was insufficient in size.

3. It was obstructed by the falling in of the decayed timber covering at the upper extremity of the culvert.

4. The injury to plaintiffs resulted from the insufficiency of the culvert and the obstruction at the northern or upper end of the same, and this was at a point sixty-seven feet north of the north railroad track, which is the track of the Bellefontaine Company.

5. The city, in the improvement of the streets, has so constructed the surface drains that the water falling on a surface of about twenty-eight squares, or one hundred and twelve acres, was compelled to seek egress through the covered culvert.

6. The only authority or grant from the city to the railroad companies of a right of way is that shown in the ordinance passed April 1st, 1850, and provides that the road may be constructed "immediately upon the north bank of Pogue's Run." * * * "Said road to be twenty-five feet wide." The road to conform strictly to the grade of all streets, "and also to provide culverts, side gutters or drains wherever they now exist, or may hereafter be needed, and shall keep the same in good repair."

It would seem to be a reasonable conclusion, that as the city had accumulated, by its system of drainage, such vast quantities of water at the point in question, it would be under obligation to see to it that there was a way provided for the water to escape without damage to adjoining property owners.

It is insisted, however, by counsel for the appellant, that it should have been found from the evidence that the railroad company or companies constructed the insufficient sewer in question, and allowed it to become out of repair; that the city, by its ordinance granting the right of way, had required the railroad company or companies to construct the necessary sewers and keep them in repair; and that if they failed to do so, the city was not liable for the consequences.

It seems to us, however, from an examination of the evidence set out in the demurrer, that the court was not bound to find or infer that the sewer in question, at the point of ob-

struction, was constructed by the railroad company or companies, but might well have found from such evidence, and from the paramount duty of the city with reference to it, that it had been constructed by the city. But suppose it was not originally constructed by the city, but by the railroad company or companies, and the city adopted it as a means of carrying the accumulated waters into Pogue's Run, and it proved to be insufficient for the purpose, or was allowed by the city to get out of repair, is it not quite clear that the city should be held liable for any damage resulting from the insufficiency or obstruction thereof? If the city chose to make a joint arrangement between itself and the railroad corporations for the keeping up of the sewer, and neither of them attended to the duty, would not the city be properly held liable for the damages? If the city was not under any obligation to grant the right of way to the railroad company or companies, but did so, and took the promise of those corporations to construct all necessary sewers, etc., and keep them in repair, must it not be held responsible for the failure of those to whom it has transferred the duty, and settle the account with them? Having full and exclusive power over the streets, highways, alleys, and bridges within the city, can the city abdicate this power and consequent duty, or transfer it to some one else, and not be responsible for the failure of such substitute? But suppose the appellees, instead of suing the city, had sued the railroad company or companies for the damages sustained by them; if the railroad company or companies could not have denied the making of the defective culvert, might they not well have said that it was not in consequence of their fault or omission that such large quantities of water were accumulated at the point in question; that but for this the sewer would have been sufficient, and the injury would not have happened? Had the sewer or culvert been constructed for the exclusive use of the railroad company or companies, it seems that the city would not have been liable. *Stackhouse* v. *The City of Lafayette,* 26 Ind. 17.

The City of Indianapolis *v.* Lawyer *et al.*

It seems that a city compelled to pay damages in a case like this may have its action for indemnity against the party in fault. *Chicago City* v. *Robbins*, 2 Black, 418; *Lowell* v. *The Boston, etc., Railroad Corporation*, 23 Pick. 24.

We think the court committed no error in overruling the demurrer to the evidence.

With reference to the numerous interrogatories propounded to the jury, and those which the defendant sought to have propounded to them, we think there was no available error. The interrogatories related to the particulars concerning the damages which the jury were to assess, and not to any "question of fact" within the meaning of sec. 336, 2 G. & H. 205. We are of the opinion that no interrogatories to the jury in such an inquiry as this are admissible. The section referred to provides that the court shall in all cases, when requested by either party, instruct the jury, if they find a general verdict, to find especially upon particular questions of fact, to be stated in writing. The jury had been excused from finding a general verdict in this case, and consequently there could occur no contingency which made it proper that any interrogatories should be submitted to them. We are inclined to limit, rather than improperly to extend, the practice of propounding so many interrogatories to the jury.

It is made a question whether there could, in this case, properly, be a motion made for a new trial. Counsel have furnished us with no authorities upon the point, and in a limited search we have found none. We think, however, that no good reason was shown for the granting of a new trial, if in such a case a new trial could have been granted.

The judgment is affirmed, with costs.

*B. K. Elliott* and *J. S. Harvey*, for appellant.

*J. T. Dye* and *A. C. Harris*, for appellees.