The State, *ex rel.* Roundtree, *v.* The Board of Commissioners of Gibson Co.

No. 8980.

THE STATE, EX REL. ROUNDTREE, *v.* THE BOARD OF COMMISSIONERS OF GIBSON COUNTY.

BRIDGES.—*County Commissioners.*—*Duty to Repair.*—*Mandate.*—Mandamus will lie to compel county commissioners to keep public bridges in repair. This duty extends to replacing, or rebuilding, where there is a substantial destruction of the original bridge.

SAME.—*Adoption Makes Public.*—A county by adopting a bridge constructed by private individuals makes it public and becomes bound to keep it in repair.

From the Gibson Circuit Court.

*R. M. J. Miller,* for appellant.

*C. A. Buskirk,* for appellee.

ELLIOTT, C. J.—It was held in *The State, ex rel.,* v. *Demaree, post,* p. 519, that the statute imposes upon the county commissioners the duty of keeping public bridges in repair, and that mandamus will lie to compel the performance of that duty. This decision disposes of one of the principal questions in the case before us.

There are two questions presented in the case at bar which were not directly presented in the former. They are:

1st. Does the duty to repair extend to replacing or rebuilding, where there is a substantial destruction of the original bridge?

2d. Is the county bound to repair in cases where the bridge is originally constructed by private individuals, but is afterwards connected with highways constructed by the county, and is used and recognized by the citizens and officers as a part of the public way?

Of these in their order.

First. The duty to repair includes the rebuilding of bridges where they are essential to the existence and use of the highway. It is true, that the commissioners have authority, in certain cases, to vacate highways, but this authority must be exercised in the manner prescribed by law. The vacation of

a highway can not be brought about by the refusal of the commissioners to perform their duty respecting it. They are charged with the duty of keeping the highways reasonably safe and convenient for use for the purposes for which they were laid out, and they can not, by a failure to do their duty, deprive the citizens of the State of their right to use and enjoy the way common and free to all. As long as the highway exists, the officers, in whose control it is, must do their duty in keeping it in a reasonable and suitable condition for travel. The case in hand strongly illustrates the soundness of the principle, that it is the duty of the commissioners to rebuild a bridge which forms an essential part of a much-traveled highway. If the bridge is not rebuilt, a public way is cut in two, and rendered useless for all practical purposes. Citizens are deprived of the use of a road which they are taxed to support, for without a bridge the highway is, for the greater part of the year, rendered impassable.

It is established law that a county is liable for injuries received because of negligence in not making bridges safe for travel, and citizens who are compelled to bear the burden imposed by a judgment for damages ought, in justice, to be entitled to compel their officers and representatives to perform their duty, and make highways passable and safe. Unless the performance of this public duty can be coerced, it leaves the taxpayer too much at the mercy of negligent officers. If it is a duty, there ought to be a power somewhere to compel its performance. Better compel the commissioners to expend public money in making highways passable and safe, rather than suffer it to be frittered away in the payment of damages.

It is very clear that if there is a decay of the timbers of a bridge, rendering it impassable, the county may be compelled to repair. Upon this point the authorities are agreed. It is difficult, if not impossible, to perceive why the same principle should not apply where a bridge has been destroyed by fire or swept away by a flood. The reason, upon which the rule requiring repairs to be made rests, is the same whether

there be a total or a partial destruction of the bridge, for the reason of the rule is, that the officers owe the public a duty to keep highways in a proper condition for travel, whether the bridge is rendered entirely unfit for use by the decay or breaking of the materials of which it is constructed, or carried away by a flood; the result to the public is the same in either case. There is no solid ground upon which to rest a distinction between the case of a bridge becoming entirely unfit for use by the giving way of some of its parts, and that of a bridge being carried off by a flood. Replacing by repairs a structure destroyed by decay is, in reality, the substitution of a new for the old, and replacing a bridge destroyed by fire or water is nothing more.

In *Briggs* v. *Guilford*, 8 Vt. 264, it was assumed, without debate, by court and counsel, that the duty to repair embraced the obligation to rebuild a bridge which had been carried away by a freshet. It was held in *People* v. *City of Brooklyn*, 21 Barb. 484, that a statute providing for repairs of a street embraced the act of substituting new curbstones for old ones. The definition of Walker, that repair means " reparation, supply of loss, restoration after dilapidation," is approved. The case of *People* v. *Hillsdale, etc., Co.*, 23 Wend. 254, decides that a statute requiring a turnpike company to make repairs imposed upon it the duty of rebuilding a bridge which had been destroyed by an inevitable accident. In the case decided by Lord Kenyon, *Brecknock, etc., Co.* v. *Pritchard*, 6 T. R. 750, it was held that a covenant in a contract, binding a party to keep a bridge in repair, imposed upon him an obligation to replace it, although it was totally destroyed by a flood. More directly in point than any of the cases cited is that of *Howe* v. *The Commissioners, etc.*, 47 Pa. St. 361. The court there said: " If we should construe the word ' repair' in this act as strictly as the court below did, nay, if we should set aside the act altogether, the duty of maintaining the bridge, once legally imposed upon the county, and never taken off, would still have to be enforced. But we can not so read the act as to exclude

the restoration of a broken superstructure. What but a 'repair' of the bridge is the renewal of the superstructure?" At another place in the same opinion, it is said: "We can not graduate repairs, and say slight ones shall be done, and large ones may be neglected. The Legislature did not mean we should do this. They meant by repairs whatever was necessary to make bridges safe and passable."

In giving to the word repairs the meaning of restoring or rebuilding, no new legal signification is annexed. From the earliest times of the common law to the present the word has been deemed to embrace rebuilding. This is proved by the long line of cases declaring that where a tenant covenants to repair he is bound to rebuild, even though the demised premises are totally destroyed. Nor in doing this is any violence done to language. The lexicographers give as a synonym of repair, "to restore," and, surely, to put a new bridge in the place of one destroyed is, in effect, nothing more than a restoration.

We come now to the second question. In a very old case referred to by counsel in *Rex* v. *West Riding*, 5 Burr. 2594, it was said, "That if a private person build a bridge which afterwards becomes a public convenience, the county is bound to repair it." In the case in which this citation was made in argument it was held, that, although the bridge was not erected by the Riding, yet, if it was a public convenience, and adopted and used by the Riding, it was bound to repair. The reporter says: "The court were all clear, that the Riding was obliged to repair the new bridge." Justice Willes said: "The county have had the advantage of it" (the bridge) "above twenty years: and they ought to repair it." Justice Blackstone, concurring, remarked: "Here, the benefit and utility were to the *public:* it was constantly used by every one who went that road." The report also states: "Lord Mansfield (who came into court during the discussion of this case), declared himself likewise to be clearly of the same opinion. The Riding

ought to repair it, undoubtedly." In *Rex* v. *Yorkshire W. R.*, 2 East, 342, Lord Ellenborough, having made a quotation from Lord Coke, proceeds as follows : "Again he says, ' if a man make a bridge for the common good of all the subjects, he is not bound to repair it; for no particular man is bound to reparation of bridges by the common law but *rationæ tenuræ* or *prescriptionis.*' Now that this bridge is for the common good is proved by the use of it by all the king's subjects passing that way, by its not having been treated as a nuisance, but acquiesced in.   Then after having enjoyed the benefit of it, shall the public object to it when they begin to feel the burden of repair?   The doctrine laid down by Lord Coke has been since recognized in the cases referred to, and in other books; particularly it was much considered in the case of Glusburne bridge; upon the authority of which other cases have been since ruled. * * The rule laid down by Mr. Justice Aston, in the Glusburne bridge case seems to be the true one; ' that if a man builds a bridge, and it becomes *useful* to the county in general, the county shall repair it: ' He says nothing about the *adoption* of it by the public; and there is good sense in not relying on that, except *as evidence* of its being a public bridge, and of utility to the public." It will be observed that the case from which we have quoted goes much further than we are required to go, for in the case in hand there was an adoption by the public.   The doctrine declared by Lord Ellenborough is fully sustained by the English cases. *Regina* v. *Wilts*, 3 Salk. 381; *Regina* v. *Buccleugh*, 6 Mod. 150; *Rex* v. *Lancashire*, 2 B. & Ad. 813; *Rex* v. *Kent*, 2 Maule & S. 513.   The common law upon this subject is settled, and, as that law is in force in Indiana, it governs this case, unless there is some statutory enactment changing the rule. We have not been able to discover any statute changing the rule, and we must hold it to be in force and applicable to this case.   There are many American cases declaring and enforcing the rule of the common law.   In *The State, ex rel.*, v. *The Supervisors*, 41 Wis. 28, it is held that if a county purchases

a bridge built by a private corporation, it is bound to keep it in repair, and that mandamus will lie to compel the performance of this duty. We suppose it can make no difference whether the acquisition is by purchase or by adoption. The principle is the same in both cases. More directly in point is the case of *Town of Dayton* v. *Town of Rutland*, 84 Ill. 279. In that case it was held that the acceptance of a bridge built by private individuals might be inferred from building a road to connect with it and levying a tax for repairs, and that the towns accepting it were bound to keep it in repair. There are well considered cases, holding that where bridges are built by turnpike companies and afterwards abandoned, they revert to the public, and that if they are accepted and used as part of a public highway, the county must maintain them in proper repair. *State, ex rel.,* v. *Lawrence, etc., Co.,* 22 Kan. 438; *Craig* v. *People,* 47 Ill. 487; *Central Bridge Co.* v. *The City of Lowell,* 15 Gray, 106.

The general doctrine upon the subject is thus stated in *The State* v. *The Town of Campton,* 2 N. H. 513: "Though the use and repairs of it" (the bridge) "may have been under a protest against their liability, and for a shorter period than twenty years, the liability is still fixed, if the bridge be not indicted as a nuisance and be used by the public so long and so much as to evince its usefulness to them." Another court thus states the doctrine: "The purport of a number of authorities appears to be, that any person may erect a bridge over a stream crossing a public highway, if it be of public utility. If it be built in a slight and incommodious manner, it may be treated as a nuisance. If not so treated as a nuisance, and it be really for the use and benefit of the public, then the charge of its repair is thrown on the county." *Bisher* v. *Richards,* 9 Ohio St. 495. In *Requa* v. *City of Rochester,* 45 N. Y. 129, the court used this language: "So the bridge, whether originally placed there by the corporate authority or by one volunteering to do that which that authority ought to have done, became the property of the city. In the first instance, plainly

enough. In the second instance, by acquiescence in its being laid there, by adopting it, by receiving it as a gift, in kind as it would take and accept a street by dedication of the owner of the land. And in the one case as in the other, being bound, after acceptance to keep it in condition for safe passage over it." Of the many cases illustrating the general rule under consideration, we cite the following: *Houfe* v. *Town of Fulton*, 34 Wis. 608; S. C., 17 Am. Rep. 463; *Batty* v. *Duxbury*, 24 Vt. 155; *Dygert* v. *Schenck*, 23 Wend. 446; *Mayor* v. *Sheffield*, 4 Wal. 189. The principle laid down in the cases to which we have referred is substantially the same as that declared in *City of Indianapolis* v. *Lawyer*, 38 Ind. 348, where it was held that a city, which makes use of a culvert constructed by a railroad company, thereby adopts it, and is responsible for neglect to keep it in proper repair.

The second question stated must be answered in the affirmative. A county may, by adoption, make public a bridge constructed by private individuals, and, when it is thus made public, becomes bound to keep it in repair.

The court below erred in sustaining the demurrer. to appellant's complaint, and the judgment must be reversed.