THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF MORRIS, PLAINTIFFS IN ERROR, v. EDWIN HOUGH AND MARTHA HOUGH, DEFENDANTS IN ERROR.

1. This action lies against the board of chosen freeholders of Morris county, under the supplement to "An act respecting bridges," approved March 15th, 1860. *Rev.*, *p.* 86, ¿ 9.

2. It was the duty of the board to rebuild the bridge in Union street, in the town of Dover, when the old bridge over the Rockaway river was broken down and became unfit for use.

3. That duty involved the furnishing of a safe and convenient access to said bridge, both as to its footways as well as its roadway.

4. That when, in the performance of that duty, they adopted a plan which contemplated the filling in of the sidewalk of Union street, either by the town of Dover or the adjacent property owners, so as to bring the sidewalks up to the wing or abutment walls of the bridge and level with the top thereof, so as to then leave the access to the footwalk of the bridge in a dangerous condition, it was their duty to place some barrier or guard, light or warning at this dangerous point.

5. That while they were preparing a permanent railing to place at this point, which would have rendered the approach entirely safe, it was their duty, when the danger became apparent by the construction of the raised sidewalk, to place some temporary barrier, light or warning at this dangerous point until the permanent railing was placed in position.

6. That it was negligence on their part not to provide such a temporary barrier after they had notice of the dangerous condition of the access to the bridge at this point.

7. That the open and notorious continuance of this dangerous condition for over two weeks before the injury, was sufficient to warrant the jury in charging the authorities with notice thereof, the same as if they had received actual notice.

8. The negligence of the defendants did not arise from any actual knowledge or any affirmative act on their part, but from their omission of the duty of inspecting, and of that degree of diligence which might reasonably have been expected from them under all the circumstances of the case. They had full opportunity of knowledge, and that stands, for the purposes of this case, as actual knowledge, and the defendants are equally chargeable as if express notice had been given them.

This case comes before the court on writ of error to the Morris Circuit Court, where the plaintiff below, Martha

Hough, obtained a verdict of $5,000 and her husband $1,500. The facts of the case appear fully in the opinion of the court.

For the plaintiffs in error, *Joshua S. Salmon* and *Willard W. Cutler*.

For the defendants in error, *Joseph A. Beecher*.

The opinion of the court was delivered by

ABBETT, J.   This is an action brought for the recovery of damages resulting from an injury received by Mrs. Martha Hough, one of the plaintiffs, and for which it is claimed that the board of chosen freeholders of Morris county are responsible.   It includes, first, her claim, and, second, that of her husband.   On October 26th, 1891, Martha Hough was injured by falling from the abutment or wing wall of a bridge over the Rockaway river, in Union street, in the town of Dover.   The accident occurred as she was passing along Union street.   The street, and the bridge connecting the same, both before and at the time of the injury, were used as a continuous public street and highway.   The bridge was the connecting link across the Rockaway river.   She was walking on the sidewalk on the easterly side of Union street, on her way home, which necessarily led her across the bridge.   The night was dark and rainy.   She was unable to see for any distance, and, relying on the sidewalk as a safe access to the footway of the bridge, she proceeded along Union street and walked off the wall at the place where the sidewalk of Union street abutted and joined the abutment or wing wall on the easterly side of the bridge.   The sidewalk and the top of this wall were about on a level.   There was no light, no barrier, no protection.   The unguarded wall at the end of the sidewalk, in the condition it was on the night of the accident, was dangerous to pedestrians.   The evidence shows that this bridge was built to replace an old wooden truss bridge that had broken down and was impassable.   The defendants appointed a committee to rebuild the bridge, replacing it with a

new iron structure, which was to be some sixteen feet wider
than the old bridge, and over two feet higher.   They also
provided in their contracts for filling in with earth behind the
abutments, to make a safe and commodious roadway approach
to the bridge.   The bills for the work were from time to time
reported by the committee and ordered paid by the defend-
ants.   After the main structure had been practically com-
pleted, and about three weeks before the accident occurred, the
chairman of the committee, under authority of the committee,
ordered Foster Burch to measure the bridge as far as the line
of the sidewalk and get a railing ready and put it on.   He
got it ready in his shop and commenced drilling holes in the
coping on top of the abutments or wing walls in which to
fasten the railing, and this work was in progress when the
accident occurred; it was finished a few days thereafter and
the bill therefor was paid by the board of chosen freeholders.
This railing was about three to three and a half feet high,
and was connected with the bridge posts which had thereto-
fore been erected, and the railing extended across the sidewalk.
The evidence shows that when the new bridge was being built
it was intended to raise the grade of the street in approaching
it.   The abutments or wing walls having been raised about
two feet or more above the old walls, it was necessary to raise
the grade of the street so as to have a safe and convenient
access to the new bridge, which was so much higher than the
old one.   If there had been no filling in after the bridge was
finished, both the walls and the bridge resting thereon would
have been over two feet above the grade of the street.   In
order to make the bridge useful to the public, it was neces-
sary to make the approaches thereto conform to the new
elevation.   It is clear that the defendants, through their com-
mittee, contemplated as part of this safe and convenient access
a railing along the wing walls of the bridge at the ends of
the sidewalk.   Without such a barrier it would not be safe
when the sidewalks were filled up to the new grade, and it is
evident that they so understood it when they entered into a
contract with Burch for the erection of this iron railing.   The

sidewalk was raised and the flagging put thereon up to the wing walls while the defendants, through their committee, were progressing with the work of putting up the railing. The drilling of the holes in which to insert the railing had been nearly completed at the time of the accident, and was finished and the railing put up shortly after it had occurred. The defendants, however, failed to put up, during the progress of this work, any barriers or lights by which the public would be warned of the danger existing at this point. It is clear that the access, according to this contemplated plan, was a safe and convenient one. The old bridge was narrower than the new one, being only twenty feet wide. The new bridge is thirty-six feet wide, of which twenty-four feet in the centre is designed for a roadway, and six feet on each side is raised some inches above the roadway, and is designed as a passage-way for persons on foot. The new bridge stands in the middle of Union street, which is sixty-six feet wide. The new bridge being higher than the old one required some filling or grading —some construction back of the abutments—in order to afford a safe and convenient access thereto. This filling was done by the defendants back of the main structure of the bridge, and it raised the ground next to the bridge up to the level of the roadway thereof, and that level extended to the east post on the south end of the bridge; from that post the wall upon which the bridge rested continued on across the sidewalk. This wall was a part of the construction of the bridge. It had been done under contract, and it had been determined by the committee of defendants, on July 29th, that on the top of it a railing should be erected.

On this last date the work already completed was examined and approved, and the bridge became a public work, con-structed by a public corporation and opened for public use. The bridge was not, however, at that date entirely completed so far as access to it from the easterly sidewalk of Union street was concerned. The plan adopted contemplated raising the sidewalk on each side of the bridge structure. It is evi-dent that the committee did not contemplate the filling up of

the sidewalk by the defendants; the filling was to be done either by the authorities of Dover or by the owners of property on Union street. The committee's plan contemplated access to the footway of the bridge over this filling by others. The laying of flagging on this filling on the easterly side of Union street, between Blackwell street and the Rockaway river, was commenced on the 5th of October, 1891, and finished on the 10th of the same month. It ended at the abutment of the Union street bridge over the Rockaway river. It was laid up to the abutment wall of the bridge, and the surface of the top of the abutment wall was about on a level with the surface of the flagging. This sidewalk ran straight up until it came to this river wall, and then made a turn at a right angle and went along the river wall about eight feet until it came to the footway of the bridge. The filling up of the sidewalk, so as to lay the flags thereon, was going on during the building of the bridge, and it had all been completed and the flags laid thereon by the 10th of October, sixteen days before the accident occurred. The work of preparing the railing and drilling the holes therefor was progressing at the same time, although the railing was not put up until after the accident. The access to the footway of the bridge was intended to be over this sidewalk when raised. From October 10th to October 26th, access to the footway of the bridge was left in a dangerous condition, without guard or warning, so that one walking on the easterly sidewalk of Union street, towards the bridge, was liable to walk directly over the wing wall or abutment into the Rockaway river. The defendants neither put up any temporary barrier nor placed any light or warning of any kind at this dangerous point. They left it open and unguarded. The evidence shows that, on the night in question, although it was so dark that it was impossible for anyone walking along the sidewalk to cross the bridge, to see the danger, they left it wholly unguarded. The case was left to the jury, and there was a verdict for the plaintiffs. This case comes up on bill of exceptions. The first exception was to the refusal to nonsuit,

on the ground that the plaintiffs had not established a legal cause of action against the defendants. Second, a general exception to that part of the charge of the judge which is as follows: "Now, gentlemen, was the plan designed for access to the footways of the bridge such as, either originally or as modified, on that day contemplated the filling up of the sidewalk and the construction of the footway thereon up to and across the wall, so as to reach and give convenient access to the footway of the bridge? Was that the plan in the contemplation of the committee who represented the defendants, and did they contemplate, not the filling up themselves, but to adopt the filling up of others? If not, gentlemen, then I am obliged to charge you the defendants were not responsible for the construction of what was not within their plan, provided the plan they did adopt furnished a safe and convenient access to the bridge. And it would be immaterial, in this case, whether it did or not, because it is not at all in question that the injury here happened, not because of the original access to the bridge provided by the freeholders, but because of the filling up of the sidewalk by others. But if the plan as originally made, on which question you may take into consideration the fact of their building the wall to that height did contemplate the filling up of the sidewalks of the street in the manner and with the effect I have mentioned, or if the plan was modified on July 29th so as to include such filling up of the sidewalks of the street, and on this question you may take into consideration the contract for the railing, which is of importance in the evidence, then, gentlemen, since the duty of the defendants was to make a safe passage, if, by their plan of access, they adopted the filling of others, and a safe passage required a barrier or protection along the wall, then, gentlemen, it was the duty of the defendants to erect that barrier. Now, if you come to that conclusion, you must then determine whether there was a wrongful neglect of that duty. It is evident that the circumstances were known to the committee, and, acting on the circumstances, they ordered the railing. They provided what would, when placed in

position, be a barrier and protection, and there is no dispute, in this case, that it would be a safe barrier and protection. Now comes, gentlemen, the important and turning point in this case—were they wrongfully neglectful in not furnishing some temporary barrier or protection pending the erection of the railing? If the plan, either as originally made or as modified, contemplated a sidewalk filled in, and a foot passage along the dangerous edge of this wall to the footway of the bridge, then, gentlemen, a duty devolved on the freeholders to take proper and reasonable precaution to have notice of that filling in, which they were to adopt as part of their plan, and to erect some temporary barrier until the railing, which they had ordered, should be erected."

The exceptions to the refusals to charge otherwise than as charged, are as follows :

3. That there was no evidence that the defendants adopted any plan with reference to the filling up of said sidewalk, that was to be carried out by any other person.

5. That there was no evidence to show that the defendants had actual knowledge or notice that the approaches to the bridge had become in a dangerous condition by reason of the change of grade of Union street or of the filling of the sidewalk, and that, therefore, if they were in a safe condition on the 29th day of July, when their work was completed, they would not be liable unless actual notice of the change in the condition of the approach to the bridge had been given to defendants.

6. That the river or wing wall was not a part of the bridge or its approaches which the defendants were required to keep in repair.

7. That if the defendants ordered a railing put up along the wing wall, which it was not their duty to order or erect, they would not be liable for any injury which may have occurred to the plaintiffs by reason of the railing not being erected at the time of the accident.

There are three other requests to charge, being Nos. 1, 2 and 4, which are specifically stated hereafter.

An action for these injuries would not lie against the defendants at common law, but the supplement to "An act respecting bridges," approved March 15th, 1860 (*Pamph. L., p.* 285; *Rev., p.* 86, § 9), provides that: "In all cases where a township · or the board of chosen freeholders of a county are chargeable by law with the erection, rebuilding or repair of· any bridge or bridges, and the said *township or board of* chosen freeholders shall wrongfully neglect to erect, rebuild or repair the same, by reason whereof any person or persons shall receive injury or damage in his or their persons or property, he or they may bring his or their action of trespass on the case against said township or said board of chosen freeholders, as the case may be, and recover judgment against them to the extent of all such damage sustained as aforesaid, which said judgment shall be paid by the township or county, as the case may be."

This act has been held to be a remedial statute and to be one that should be construed to give a remedy by action for all injuries to persons or property where the municipal body is bound by law to build, rebuild and repair a bridge, with a view to the safety to persons and property, and it shall neglect to perform the duty thus required. of it and damage shall result directly to those persons or that property. *Jernee* v. *Monmouth,* 23 *Vroom* 553, 557.

The liability under this act only arises in this case if the· proofs establish—*First,* that the board of chosen freeholders were chargeable by law with the erection, rebuilding or repair of the bridge in question. *Second,* that the board wrongfully neglected to erect, rebuild or repair the same. *Third,* that the injury to Mrs. Hough was occasioned by such wrongful neglect.

The board of chosen freeholders were clearly chargeable with the erection, rebuilding and repair of the Union street bridge over the Rockaway river. *Freeholders of Sussex* v. *Strader,* 3 *Harr.* 108. This duty not only required the defendants to .replace the structure across the stream with a new one, but it also required them to make the new bridge

accessible at its ends. To make a complete passageway across the Rockaway river for the public, the defendants were bound to fill up at the ends of this bridge so far as to make it a safe and convenient passageway for such persons as might be entitled to use the same. The duty to make and repair the highways, at the ends thereof, so as to make the bridge accessible therefrom, was not only a statutory duty, but was a duty at common law. *Freeholders* v. *Strader, supra; Proprietors of Bridges* v. *Hoboken Land and Improvement Co.*, 2 *Beas.* 503, 524; see, also, *Moreland* v. *Mitchell County*, 40 *Iowa* 394, 398.

Whether the defendants neglected to perform this duty of replacing the old structure and providing the public with a safe and convenient access thereto, was a question of fact for the jury upon the evidence.

The question as to whether the injury to Mrs. Hough was occasioned by the wrongful neglect of the defendants, was also a question for the jury.

The board was bound by the action of its committee. *City of Burlington* v. *Dennison*, 13 *Vroom* 165.

The verdict of the jury having settled all disputed questions of fact in favor of the plaintiff, the judgment in this case should be affirmed unless the trial judge erred in his rulings, as shown by proper exceptions allowed and sealed in this case.

The first exception is to the refusal to nonsuit. This is defective because it does not show that the precise point on which a review is sought was made by counsel and presented to the mind of the trial judge and decided by him. The only ground stated was that the plaintiff had not established a legal cause of action against the defendants. If such an objection is sustained it would impose upon the trial judge the necessity of considering every legal proposition that might arise in the case and all the evidence therein, and if he erred the judgment would be reversed, although counsel had failed to state the grounds of objection, so that the court might fairly consider each of them, as thus presented. Such a gen-

eral objection is not framed with that particularity required by the rules laid down in *Associates of the Jersey Co.* v. *Davison*, 5 *Dutcher* 415 ; *Packard* v. *Bergen Neck Railway Co.*, 25 *Vroom* 229. An example of proper particularity in stating the grounds relied upon as a motion for nonsuit will be found in *Central Railroad Co.* v. *Moore*, 4 *Zab.* 824.

The next exception is to the charge of the judge. This is clearly multifarious. It embraces several legal propositions, some of which are clearly unobjectionable so far as the defendants are concerned. It cannot be upheld *in toto*. *Packard* v. *Railway Co.*, 25 *Vroom* 229.

The exception to the refusal to charge as stated in the third request cannot be sustained, because it assumes that there was no evidence on the point involved therein, whereas there was evidence in the case affecting this question.

The exception to the fifth refusal to charge as requested cannot be sustained, because it assumes that the bridge was completed July 29th, when there was evidence from which it might be inferred that it was not entirely completed on that date, and because actual notice of the condition of the sidewalk thereafter was not necessary, as hereinafter stated.

The exception to the sixth refusal to charge cannot be sustained, because it assumes as matter of fact that the river or wing walls were not part of the bridge. If they were, and there was evidence upon that point, the defendants would be bound to keep them in repair the same as any other part of the bridge.

The exception to the seventh refusal to charge cannot be sustained, because it would in effect be instructing the jury that ordering a railing to be put up, which it was not their duty to put up, would relieve the defendants in this case when the liability (if any) results from defendants not putting up some temporary warning barrier or protection while the railing was in course of construction. The duty was not necessarily to put up a railing, but to furnish plaintiff a safe and convenient access to the footwalk of the bridge, which could have been done in various ways other than by a railing. The

charge of the judge fairly left this matter to the jury, if his view of the law is correct.

The refusals to charge the first, second and fourth propositions, however, involve a consideration of legal principles which, if the judge improperly refused to charge, would require the judgment in this case to be reversed.

These requests were as follows :

1. That if the approaches to the bridge were safe and convenient when it was "taken up" by the committee of the board of chosen freeholders having charge of the building of said bridge, on the 29th day of July, and they would have continued to be safe and convenient if they had not been changed by parties other than the defendants and without their knowledge, the defendants would not be responsible for the injuries received by Mrs. Hough.

2. That unless the evidence showed that the defendants had actual knowledge of the way in which the sidewalk would be filled in, the extent of the filling, the time when the filling would be done, they would not be responsible by reason of any plan which they may have contemplated, or which they may have supposed might be adopted by the town of Dover, or by the owner of the adjoining property.

4. That if the approach to the bridge, as made by defendants, was safe and convenient, though they may have contemplated a plan of filling of the sidewalk that might at some future time be adopted by the town of Dover, or by the owner of the adjoining land, and undertook to provide for such condition, they would not be responsible for the injury to Mrs. Hough, unless they had actual knowledge or notice that the work was to be done at once, or that the work was in progress, or had been completed.

In considering the questions presented, we may assume that if the duty of the defendants had been ended July 29th, when the main structure of the bridge had been finished and the roadway of the street had been graded up to meet it, the defendants would not have been liable, because the work had been left in such a condition that the sidewalks of the street

met the wing walls two or three feet below the top thereof, and it would have been impossible for plaintiff to have walked over the same.  The difficulty with the defendants' case is, however, that the bridge and its approaches were not then finished, according to the plan contemplated by the defendants ; they had then determined to erect a railing on the wing walls as a barrier or protection at the end of the sidewalks on Union street, as they would exist when filled up to meet the new grade of the street rendered necessary by reason of the defendants having raised the new bridge some two or three feet above the height of the old bridge and the old grade of the street.  This contemplated filling had been completed some sixteen days before the accident, and the danger existing was open and notorious during all that time, and the defendants were proceeding with the work of putting up the railing, which would have been a complete protection if it had been finished ; but they allowed the dangerous condition to continue for these sixteen days without any temporary barrier, light or warning to give notice to pedestrians of this danger. The question here presented is, Were the defendants, with this opportunity of knowledge, and their failure during that period to see the existing danger and provide against it, guilty of a wrongful neglect under the act of 1860, the same as if they had received actual notice of the condition of affairs and the danger, and had expressly refused to provide against the same ?

The court seems to have presented the case fully and fairly to the jury and dealt most carefully with the rights and duties of the defendants under the evidence.  An examination of the charge shows that the following propositions, among others, were laid down by the trial judge :

1. That the liability of the defendants (if any) arose under the supplement to the Bridge act of March 15th, 1860 (*Rev.*, *p.* 86), on account of the wrongful neglect of the defendants to rebuild or repair Union street bridge over the Rockaway river.  That no liability existed in this case unless the proofs established—*first*, that the defendants were chargeable by

law with the erection, rebuilding or repairing of the bridge; *second*, that the defendants wrongfully neglected to erect, rebuild or repair this bridge; and, *third*, that the injury to Mrs. Hough was occasioned by such wrongful neglect.

2. That it was the duty of the defendants to provide at each side of the Rockaway river, which it spans, a safe and convenient access to the bridge for passengers by filling in, or by some other mode, and that the same is part of the bridge construction.

3. That the new bridge, being some two feet higher than the old one, required some filling or grading—some construction back of the abutment.

4. That although the bridge committee, on July 29th, examined and approved of the work done up to that time, and it then became a public work, constructed by a public corporation, and open for public use, it was still a question for the jury, if it was then completed.

5. That whether it was then completed depended on what was the plan and design either originally made or as modified July 29th.

6. That it might be inferred that it was expected that the sidewalks on Union street, if ever laid, would be laid up to and made to adjoin the raised footways on the bridge.

7. That on July 29th the committee of defendants discussed the question of these sidewalks and the necessity, if they were raised at some future time, to put a railing on the wall, and that thereupon the railing was ordered and the bill therefor paid by the defendants.

8. That it was for the jury to say whether the plan designed for access to the footways of the bridge contemplated the filling up of the sidewalk and the construction of the footway thereon to and along the wall so as to reach and give convenient access to the footway of the bridge.

9. That if such plan did not contemplate the filling by others, which the defendants were to adopt, that the defendants were not liable because they were not responsible for the construction of what was not within their plan.

10. That it was immaterial in this case whether the original access to the bridge, as it existed on July 29th, furnished a safe and convenient access thereto, because the injury here happened not because of the original access to the bridge provided by the freeholders but because of the filling up of the sidewalk by others.

11. That if the plan the committee did adopt (including the filling of the sidewalks by others) required a barrier or protection along the wall to make a safe passage, that it was the duty of the defendants to erect that barrier.

12. That it was for the jury to say, if such a duty existed, whether there was a wrongful neglect of that duty.

13. That if defendants' plan contemplated a sidewalk filled in by others, and a footway along the dangerous edge of this wall to the footway of the bridge, a duty devolved on the freeholders to take proper and reasonable precaution to have notice of that filling in which they were to adopt as part of their plan and to erect some temporary barrier until the railing which they had ordered should be erected.

14. That it was for the jury to say if defendants were wrongfully neglectful in not furnishing some temporary barrier or protection pending the erection of the railing.

The propositions laid down by the judge seem to have been entirely correct. I have already cited the cases showing that it was the duty of the defendants to make safe and convenient access for the public from the sidewalk to the footway of the bridge, and that it was their duty, even at common law, to make and repair the highways at the ends of the bridge, if necessary for this purpose.

It has been held that it is not necessary that actual notice should have been given or that persons liable for the keeping of a bridge in repair should have actual knowledge of the dangerous condition of the access to the bridge. The rule laid down is that if, by the exercise of ordinary and due diligence and care, they would have had such knowledge, it is sufficient. In *Reed* v. *Northfield*, 13 *Pick.* 94, 98, it is said that "The evidence of notice to the public of the dilapida-

tion of the highway and bridge complained of was rightly left to the jury. It has often been held, in giving construction to this act, that notice to the town [the act required reasonable notice] of the defect of a highway may be inferred from its notoriety, and from its continuance for such a length of time as to lead to the presumption that the proper officers of the town did in fact know, or with proper vigilance and care might have known the fact. This latter is sufficient, because this degree of care and vigilance they are bound to exercise, and therefore if, in point of fact, they do not know of such defect, when by ordinary and due vigilance and care they would have known it, they must be responsible, as if they had actual notice."

See, also, 2 *Beach Pub. Corp.*, § 1523, and cases there cited; *Mayor, &c., of New York* v. *Sheffield*, 4 *Wall.* 189–196; *District of Columbia* v. *Woodbury*, 136 *U. S.* 450, tit. *"Highway."* Notice liability for defective highway. 9 *Am. & Eng. Encycl. L.* 401–407 and cases there cited, tit. *"Bridges."* Action, damages, notice, reasonable care, railings. 2 *Am. & Eng. Encycl. L.* 558–562 and cases cited; *How* v. *City of Lowell*, 101 *Mass.* 99; *Donaldson* v. *City of Boston*, 16 *Gray* 508. Originally, the question whether a municipality or its officers used reasonable diligence to discover a defect is for the jury. 2 *Beach Pub. Corp.*, § 1521, and cases cited.

The open and notorious existence of an obstruction on a sidewalk for five days was considered as a sufficient time to charge the authorities with notice thereof. *Kunz* v. *City of Troy*, 104 *N. Y.* 344. In this case the court says: "The negligence, if any, on the part of the city in the present case does not arise from any affirmative act, but from an alleged omission to exercise proper care and supervision and permitting the counter, unlawfully placed on the sidewalk by McLaughlin, to remain there after notice of the obstruction. * * * The city, however, was not responsible for the original wrong. Its culpability, if any, as we have said, consists in not interfering to cause the removal of the obstruction after due notice of its existence. It is not claimed that

there was any actual notice of the obstruction as to the mayor or the legislative body, or any city official, unless notice to patrolmen was notice to the city.  *   *   *   The counter was placed on the sidewalk on Tuesday and remained there until Saturday, the day of the accident, and it is not claimed that, meanwhile, any measures were taken by the authorities to have the obstruction removed.   This lapse of time, together with the fact that Federal street was in a busy and frequented part of the city, made it, we think, under the authorities, a question for the jury whether the city authorities, charged with the care of the public streets, ought to have known of the obstruction and to have caused its removal before the accident.   If the city authorities had no actual notice, nevertheless, if their ignorance resulted from the omission of the duty of inspection and of the degree of diligence which might reasonably be expected under all the circumstances, the opportunity of knowledge stands for the purposes of the case as actual knowledge, and the city is equally chargeable as if express notice had been actually proven."

See, also, *Mersey Docks Trustees* v. *Gibbs et al.*, 11 *H. L. Cas.* 686.

It is a question for the jury whether the county has been negligent in constructing an approach to a bridge.   *Moreland* v. *Mitchell County*, 40 *Iowa* 394.   These approaches must be constructed so as to be reasonably safe for passengers by night or day, or action lies.   *Baltimore and Ohio Railroad Co.* v. *Boteler*, 38 *Md.* 568.   Also, see other cases cited in 2 *Am. & Eng. Encycl. L.* 560, 561 ; and see cases cited in note to § 759, 1 *Beach Pub. Corp.* 771.

It has been held that a county may, by adoption, make public a bridge constructed by individuals, and when it is thus made public, the county becomes bound to keep it in repair.   *State, ex rel. Roundtree,* v. *Board of Commissioners of Gibson County*, 80 *Ind.* 478.   See, also, *Ell. Roads and S.* (*ed.* 1890), *p.* 23, and cases there cited.   The principle of this decision applies to the approaches as well as the main structure.

Where a bridge, being part of a highway, is undergoing repair, it is the duty of the county making such repairs to provide proper safeguards against accident. See *Mullen* v. *Rutland*, 55 *Vt.* 77, and principle laid down in 2 *Beach Pub. Corp.*, § 1514, and cases cited.

The most important point presented by the defendants against their liability in this case was their contention that the bridge and its approaches were completed on July 29th and left in such condition that this accident could not have happened if third parties had not thereafter interfered with the then existing condition and created the danger, as they claim, by raising the sidewalk on Union street to a level with the coping on the wing walls of the bridge. If we assume that the facts of the case warrant these conclusions, there would be no liability on the part of the defendants. The difficulty, however, with this contention is that the jury have found a different state of facts upon evidence properly submitted to them. The bridge was not completed July 29th. The main structure and the roadway approaches were completed, but the access to the footways of the bridge had not been completed. The plan of the committee of the defendants contemplated a structure with a sidewalk, filled in by others, protected by a railing erected by the defendants on the wing walls of the bridge. The defendants were in the performance of that duty when the plaintiff was injured. The neglect of the defendants consisted in not providing a temporary barrier after October 10th, when the sidewalk had been raised and the danger became notoriously apparent. The existence of this danger for over two weeks charged them with notice, the same as if they had been directly notified of its existence.

The judgment below should be affirmed.

BEASLEY, CHIEF JUSTICE (dissenting). The facts in this case, to which the law is to be applied, are few and undisputed. They are these: The board of freeholders, the plaintiff in error, erected a county bridge over the Rockaway river,

in the town of Dover, and as the sidewalk of the street con-
necting with it extended beyond the width of the bridge, it
became necessary to construct a wing wall at that point.
Without such a protective contrivance the sidewalk would
have been left in a highly dangerous condition, as the ground
at the place to which it led along the side of the bridge fell
away somewhat precipitously. Accordingly, the freeholders,
at the time of constructing their bridge, put up a wing wall
across the dangerous part of the sidewalk in question, which
was confessedly an adequate safeguard as things then were.
The bridge, including the sidewalk, had been built by con-
tract, and having been examined by the building committee,
and being deemed satisfactory, was approved and paid for.
In a few days after this a proposition was brought before the
building committee to put an iron railing on the top of the
wing wall above mentioned, and the witness who testified
upon this subject, and who was one of the committee and the
only witness in this respect, thus narrated the transaction,
viz. : " Our committee, some of them, thought that we did not
need any railing on it; I told them I thought we had better
have one, because at some future time it might be graded and
it would be necessary ; at that time it was not necessary."
Under these circumstances a railing was ordered. The me-
chanic thus employed neglected to put it up for a few weeks,
and in the interim the town of Dover, or a landowner, filled
in the sidewalk in question to a level with the top of the wing
wall. By this means, of course, the sidewalk was left with-
out any safeguard at its terminus by the bridge, and the
plaintiff, crossing the bridge by night, fell from the sidewalk
down the steep already mentioned, and, being injured, brought
the present action.

That the plaintiff is entitled to be indemnified for her dam-
ages by some one is certain, but the question is whether the
plaintiff in error is that responsible person.

My examination has led me to the conclusion that it is
plain that this suit, as it is now laid, will not lie. Every
ground upon which it is claimed it can be placed seems to me

to be inconsistent with established legal principles. These freeholders are sued for their negligence, and the only remissness charged is that they neglected to see that the iron railing which they had ordered was immediately placed in position. But the fallacy of this proposition appears to me to be conspicuous, for it cannot be denied that, as the case was then conditioned, these freeholders were not bound in law to put up any railing whatever. The freeholders had made the bridge and sidewalks perfectly safe, and as long as that state of things continued they could not be called upon to do anything further. To anticipate a change of the situation from the possible or probable action of the authorities of the town in the future, near or distant, and to provide for such change, was an undertaking entirely gratuitous on their part. Being a mere voluntary purpose, uncommunicated to and wholly unacted upon by any one else, it is incontestably plain that they imposed upon themselves nothing that had even a semblance of a legal liability. It was a purpose that they could abandon at will, and, consequently, they could incur no legal liability by neglecting to perform it.

In my opinion this consideration alone negatives the responsibility of the plaintiff in error for the damages sustained by the defendants in error. I cannot think that it has even been held in any decision that a person is responsible because he has merely refused or neglected to perform an act which he was under no legal obligation to perform.

At the trial the justice who presided instructed the jury that a verdict against the county could rest but on a single ground. The charge left no doubt upon that subject. It will be remembered that the bridge and sidewalk were left by the plaintiff in error in a perfectly safe condition, and that the town raised the sidewalk so as to occasion the change that proved so disastrous to the plaintiff. The trial justice informed the jury that the officers of the county, as appeared from the evidence, had no information or knowledge of the action of the municipality in this respect. After adverting to the testimony that the freeholders, in view of a probable

change of the grade of the sidewalk by the action of the town in the future, he said : " Now, gentlemen, was the plan designed for access to the footways of the bridge such as, either originally or as modified on that day, contemplated the filling up of the sidewalk and the construction of the footway thereon, to and along the wall, so as to reach and give convenient access to the footway of the bridge? Was that plan in the contemplation of the committee who represented the defendants, and did they contemplate, not the filling up, themselves, but to adopt *the filling up* of others? If not, gentlemen, then I am obliged to charge you that defendants were not responsible for the construction of what was not within their plan, provided the plan they did adopt furnished a safe and convenient access to the bridge, and it would be immaterial in this case whether it did or not, because it is not at all in question that the injury here happened, not because of the original access to the bridge, provided by the freeholders, but because of the filling up of the sidewalk by others."

It will be observed that the theory at the trial was that if the jury believed that it was within the contemplation of the freeholders that the sidewalks would eventually be filled up by the town authorities, and if, to provide for that eventuality, they ordered the railing in question to be put up, and if they were negligent in effecting such erection, then they would be liable for the injuries sustained by the defendants in error.

I have altogether failed to see how the foregoing proposition can he brought to harmonize with legal principles that have always been regarded as indubitable.

We have already seen that after the freeholders had properly built their bridge and had properly connected it with the roadbed and sidewalks, and had left these works in a safe condition, they had fully discharged their legal duty. They were under no obligation to provide at that time for any change of condition that might arise in the future from the action of other persons. It follows, of necessity, that the project of putting up a railing was an undertaking absolutely

voluntary. These propositions are most assuredly not to be denied, and the inquiry, therefore, presses when and how was this gratuitous purpose changed into a legal obligation. At the trial it was deemed that this metamorphosis took place in case this gratuitous project was part of the scheme adopted in building the bridge, but there seems to be no ground whatever for such an assumption. When these freeholders undertook to build this bridge they assumed a legal obligation; when they resolved to construct this railing they did not assume a legal obligation;· how could the fact, therefore, that they contemplated doing both these things transform the latter from a mere spontaneous intention into a compulsory duty? And yet the verdict in this case has no other foundation than the theory that such translation was effected, that because these freeholders contemplated doing that which they were not bound in law to do, that by the very fact of such contemplation they imposed upon themselves a legal duty to perform their gratuitous intention. It is to be observed in this connection that there is no pretence in the case that the municipal authorities had any knowledge that the freeholders contemplated building the railing in question, and, in raising the sidewalk, had acted on that supposition. There was nothing in the evidence to warrant such an inference, and the case was not submitted to the jury in that aspect.

In fine, on this head, my conclusion is, that when those agents of the county, in view of the probable filling up of the sidewalk in question in the future by this municipality, resolved to put up a railing on the wing wall referred to, they merely assumed to do that which at the time they were not bound to do, and that, consequently, such voluntary assumption could be either abandoned or neglected with entire impunity.

Nor does it seem that the result would be changed if we were to assume that the project of the construction of the railing in question became a legal duty on the part of the plaintiff in error.

Granting the existence of such duty and that it was negligently performed, it does not follow that the county is responsible for this damage sustained by the defendant in error. Negligence, in legal contemplation, does not entail a liability for every possible consequence that may ensue from the fact of its existence, but only for its natural and probable consequences. On this subject, Mr. Addison, in his work on *Torts,* *vol.* 1, *p.* 40, thus formulates the rule, viz. : " If the wrong and the legal damage are not known by common experience to be usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, and the wrong and the damage are not sufficiently conjoined or concatenated, as cause and effect, to sustain the action." Similarly, Baron Pollock, in one of his opinions, states the rule in these words, viz. : " I am inclined to consider the rule of law to be this, that a person is expected to anticipate and guard against all reasonable consequences, but he is not, by the law of England, expected to anticipate against that which no reasonable man would expect to occur."

In view of this rule, and it is incontestable, it appears to be plain that the present action is not maintainable. Assuming that the duty in question was neglected by these freeholders, still it is a *non sequitur* that the county is responsible for the hurt sustained by the defendant in error. The freeholders had left their work in a safe condition, and they, therefore, plainly were not the proximate cause of the accident that occurred. The municipality stood in that attitude, for it raised the sidewalk, and thereby made the place dangerous. But for the intervention of the authorities of the town, the mischief. complained of would not have happened. The town, beyond all question, was the immediate *causa causans* of the dangerous state of this street. The freeholders had left it in a safe condition and these municipal authorities then put it into an unsafe condition, and the freeholders did nothing to lead to such conduct.

The inquiry, therefore, supervenes, how are the freeholders to be connected with this wrongdoing? Most assuredly only

on the ground that they were bound to infer that this street would be raised *and left in a dangerous condition* by the municipal agents, and consequently should have provided against such an occurrence.

It will be observed that the question is not whether the elevation of the street should have been anticipated by the freeholders, but whether, as reasonable men, they should have anticipated that it would be done in such a manner as to convert it into a public nuisance, dangerous to every one who, by night, should use it. It is plain that the municipal authorities, in leaving one of the public thoroughfares in this grossly perilous state, committed an indictable offence, and, consequently, how can it be contended that the freeholders, as reasonable men, were bound to infer that such a crime would be committed? It would seem to be undeniable that it was the duty of the municipality, if it elevated its street in the manner described, to have given notice of its intention to the officers of the county, or, in the absence of such notification, to have provided a temporary safeguard against the danger itself had created. Was it in the natural sequence of affairs that it would neglect this duty, and thereby perpetrate a misdemeanor of a grave character? Such misconduct as this did not "follow in the ordinary course of events" from the neglect of duty on the part of the freeholders (admitting such duty and such neglect existed), nor could the freeholders have anticipated any such occurrence. Consequently, according to the legal rule already stated, no liability on the side of the county can result by reason of the injury to the defendant in error that forms the basis of this suit.

But, again, on the admission that the plaintiff in error was legally bound to put up the railing in question, and that it was negligent in the performance of that duty, nevertheless this action will not lie, as it was not the proximate cause of the injury. It was not enough to show that this negligence was, in a distant degree, the cause of the damage to the plaintiffs below, for, in order to validate this judgment, it must appear that it was the proximate cause. But this, it

seems to me, incontestably was not the case, for no accident was possible but for the wrongful conduct of the municipal officials. The legal principle is thus stated by Mr. Justice Dixon, in the case of *Wiley* v. *West Jersey Railroad Co.*, 15 *Vroom* 251 : "The rule of law," says the opinion, "requires that the damages chargeable to the wrongdoer must be shown to be the natural and proximate effects of his delinquency. The term 'natural' imports that they are such as might reasonably have been foreseen and as occur in an ordinary state of things. The term 'proximate' indicates that there must be no other culpable and efficient agency intervening between the defendant's dereliction and the loss." The same principle is enunciated in *Cuff* v. *Newark and New York Railroad Co.*, 6 *Vroom* 17, and in several other of our own decisions, which it is not necessary to notice. In the present instance, it is not observed upon what ground it can be said that the rule thus stated and established is not applicable; but for the intervention of the officers of the town in converting the sidewalk in question into a public nuisance, the misfortune of the defendant in error could not have occurred, and consequently, according to the rule just stated, the suppositious neglect of duty of the plaintiff was not, in legal theory, as it was not in fact, the proximate cause of the injury. How this objection to this suit is to be obviated or removed, I confess that I am at a loss to conceive. In my opinion, the town of Dover was the party responsible alone for the harm sustained by the plaintiff in this action.

In my judgment, an affirmance of this judgment must proceed on the adoption of one or more of the three following propositions, viz. : *First*, that the non-performance of a gratuitous intention may, *per se*, lay the ground of an action at law ; *second*, that a negligent person may be charged with damages that are not the "natural" effects of his delinquency ; and, *third*, that such delinquency will, in law, be deemed the proximate cause of the ensuing loss, although such loss was directly caused by the intervention of a culpable and efficient agency.

Entertaining these views, I shall vote to reverse the judgment contained in the record before us.

*For affirmance* — THE CHANCELLOR, ABBETT, DIXON, LIPPINCOTT, REED, VAN SYCKEL, KRUEGER, BOGERT.    8.

*For reversal* — THE CHIEF JUSTICE, DEPUE, BROWN, SMITH.    4.